UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

MARIO HERNANDEZ CASTILLO,      )
                               )
          Petitioner,          )
                               )
v.                             )      No.:   3:21-CV-113-TAV-DCP
                               )
GRADY PERRY,                   )
                               )
          Respondent.          )

## MEMORANDUM OPINION

Petitioner Mario Hernandez Castillo, a prisoner in the custody of the Tennessee

Department of Correction, has filed a federal habeas petition pursuant to 28 U.S.C. § 2254

challenging the legality of his confinement under Grainger County judgments of conviction

for first-degree murder, felony murder, especially aggravated robbery, and theft, for which

he received an effective sentence of life imprisonment.  Having considered the submissions

of the parties, the State-court record, and the law applicable to Petitioner's claims, the Court

finds that no evidentiary hearing is warranted, and the petition should be denied.[1]

## I.      SUMMARY OF RELEVANT EVIDENCE AND PROCEDURAL HISTORY

Jackie Petitt (the "victim") was found shot to death in the dining area of his Grainger

County, Tennessee, trailer on January 21, 2000 [*See, e.g*., Doc. 11-2 p. 31-36].  A sixteen-

---

[1]  An evidentiary hearing is only appropriate in a § 2254 action where review of the record
demonstrates that a petitioner might be entitled to relief if given an opportunity to prove the factual
allegations raised in the petition.  *See* Rules Governing § 2254 Cases, Rule 8(a); *see also Schriro
v. Landrigan*, 550 U.S. 465, 474 (2007) ("In deciding whether to grant an evidentiary hearing, a
federal court must consider whether such a hearing could enable an applicant to prove the petition's
factual allegations, which, if true, would entitle the applicant to federal habeas relief.").

year-old Hispanic male later identified as Leoncio Cantu was found shot to death outside of the home [*Id*. at 40, 75, 90]. Special Agent Carl Smith, a forensic scientist for the Tennessee Bureau of Investigation ("TBI"), was assigned as lead investigator in the case and made a videotape of the crime scene during his investigation [*Id*. at 39-41].

No weapons were located on the victim [*Id*. at 41]. Bullets from a .30 caliber weapon and ejected and unfired shells from a .30 caliber weapon were found, but that weapon was not located on the scene [*Id*. at 41-42, 47-49]. A nine-millimeter handgun was found at the scene and had fired, but not ejected, the spent shall casing found in its chamber [*Id*. at 60-61]. Testing showed a ballcap located on the scene contained a mixture of blood from Petitioner and the victim [*Id*. at 44]. The victim's vehicle, a Nissan Pathfinder, was found parked at the bottom of his long driveway [*Id*. at 50]. The victim's wallet, which contained $8.00, was found inside the Pathfinder [*Id*. at 51, 59]. Investigators located Petitioner's blood on the steering wheel and on the victim's wallet [*Id*. at 50-51]. The victim's daughter, Shelby Barnard, later testified that the victim always carried at least $500.00 in cash [*Id*. at 71-72].

Dr. Cleland Blake, chief medical examiner, performed autopsies of the victim and Cantu [*Id*. at 75-76, 78] and determined that Cantu died as a result of a .22 caliber gunshot wound to the chest [*Id*. at 78]. The victim sustained gunshot wounds of an intermediate caliber weapon to the chest and back of the head [*Id*. at 79-81]. These wounds were fatal [*Id*. at 82]. The victim also sustained twelve wounds to the head and face, including a depressed skull fracture, caused by "brutal blunt [force] trauma" [*Id*. at 84-87].

2

Shortly thereafter, Petitioner, a Mexican national with the alias Felipe Hernandez, was identified as a suspect [*See, e.g., id*. at 106-07]. Petitioner was placed on the TBI's "Top Ten Fugitive List," and his fingerprints and photograph were placed on the internet and national law enforcement databases at that time [*Id*. at 106]. On September 26, 2001, United States Border Patrol Agents observed Petitioner on camera fleeing a stopped vehicle prior to reaching a mandatory border checkpoint in New Mexico [*Id*. at 118-20]. The United States Border Patrol apprehended Petitioner and took him back to the checkpoint [*Id*. at 122-24]. Subsequent fingerprint information led the Border Patrol agent to identify the detained individual as Petitioner [*Id*. at 124-26]. While obtaining identifying information from Petitioner, the agent ascertained that Petitioner had scars from being shot [*Id*. at 126]. After the Border Patrol agents learned that Petitioner was wanted in Tennessee, they turned him over to the New Mexico State Police [*Id.* at 126-27].

Officer Felipe Gonzalez of the New Mexico State Police advised Petitioner in Spanish of his *Miranda*[2] rights [*Id*. at 127-29]. He conveyed these to Petitioner both orally and in writing [*Id*. at 129]. Petitioner opted to cooperate with law enforcement and told Officer Gonzalez that on the day of the murders, Cantu told Petitioner that they were going to a residence to meet with someone "regarding a business deal" [*Id*. at 130]. Petitioner recounted that he and Cantu took Petitioner's van to the home of Cantu's father, where

---

[2] The Court's use of "*Miranda*" is a shorthand to the well-known holding of *Miranda v. Arizona*, where the Supreme Court determined that the Fifth Amendment's prohibition against compelled self-incrimination requires that custodial interrogations be preceded by advice to the accused, such as the right to remain silent and the right to request the presence of an attorney. *See Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966).

3

Cantu retrieved a rifle [*Id*. at 130-31]. The pair then went to the victim's residence, where they and the victim eventually entered the victim's double-wide trailer to discuss "pounds, meaning marijuana, cocaine" [*Id*. at 130-31]. Petitioner stated that he exited the residence and heard two or three shots [*Id*. at 132]. Petitioner told Gonzalez that Cantu then came out of the door grasping his chest and telling Petitioner that he had been shot before falling to the ground [*Id*.].

Gonzalez stated that Petitioner recalled being "really upset and angry," and that he went inside to "make contact" with the victim [*Id*. at 132]. Petitioner stated that the victim had a gun. [*Id*. at 133]. A fight ensued, and Petitioner was shot in the torso when the victim's gun discharged in the scuffle [*Id*.]. Petitioner informed Gonzalez that he then took the weapon from the victim and beat him with it [*Id*.]. Petitioner stated that he realized that the weapon did not have any more ammunition in it, and that he went outside [*Id*. at 133-34]. Petitioner told Gonzalez that he thought the victim was trying to get another weapon [*Id*.].

Petitioner related that he noticed that Cantu was dead when he went outside, and he took the rifle from underneath Cantu's arm [*Id*. at 134]. Petitioner told Gonzalez that he also removed a magazine of ammunition from Cantu's pants [*Id*.]. Petitioner stated he waited until he saw the victim come out of his bedroom with a gun and then fired three shots that struck the victim in the torso area [*Id*. at 134-35]. Petitioner confirmed to Gonzalez three times that the victim had a gun when Petitioner shot him [*Id*.].

4

Petitioner told Gonzalez that he took the rifle and the handgun he had wrested from the victim, drove the victim's vehicle down the driveway to where his own vehicle was parked, and drove from the scene [*Id*. at 137]. Petitioner called Cantu's father and told him that his son had been shot and killed [*Id*. at 138]. Petitioner then eventually abandoned the van, disposed of the weapons, and took a bus into Mexico [*Id*. at 138-39].

In 2000, Jesse Jarnigan was a member of the Grainger County Sheriff's Department who was involved in the investigation of the victim's death [Doc. 11-3 p. 30-31]. At trial, Jarnigan testified that the victim had a camera security system and a "tone sounding system" that would send an audible alert if someone entered the premises [*Id*. at 33]. A videotape that captured the events of the shooting was played for the jury, and Jarnigan narrated the tape while it played [*Id*. at 38-46]. The Tennessee Court of Criminal Appeals ("TCCA") summarized the video as follows:

> The first image is of the victim, walking alone across his living room, carrying a large handgun. The second scene shows the victim, apparently unarmed, standing in his living room with the defendant and another man. The second man, Cantu, appears to be hiding a rifle under his long shirt. The third scene shows Cantu retreating across the living room toward the back door of the residence, carrying the rifle and holding his stomach. The fourth scene shows the victim, who appears to have been beaten, staggering in front of the defendant. The defendant gestures with a gun in one hand, while jabbing the victim in the chest with his other. The final scenes show the defendant stride toward the door and pick up the rifle which Cantu carried earlier. The staggering victim follows him. The defendant appears to be trying to chamber a shell into the rifle. Then the victim staggers against the wall, apparently having been shot in the chest. The victim then walks away from the defendant, and the defendant raises the rifle and fires it into the back of the victim's head. The victim immediately collapses. The next scene shows the defendant rummaging through the victim's pants pockets, remove an item, and place the item in his own pocket.

5

*State v. Castillo*, No. E2003-01250-CCA-R3-CD, 2004 WL 1149497, at * 3 (Tenn. Crim. App. May 21, 2004), *perm. app. denied* (Tenn. Nov. 15, 2004) ("*Castillo I*").

Jarnigan stated that the videotape did not support Petitioner's statement that he was standing outside when Cantu was shot, nor did it support Petitioner's allegation that the victim was coming toward Petitioner with a pistol when Petitioner shot the victim [*Id.* at 59].

At the close of evidence, a jury convicted Petitioner on the indicted charges of first-degree premeditated murder, first-degree murder in the perpetration of robbery, especially aggravated robbery, and theft of property under $500.00 [Doc. 11-1 p. 39-42; Doc. 11-3 p. 140]. The trial court merged Petitioner's murder convictions and sentenced Petitioner to life [Doc. 11-3 p. 147]. After consulting with his attorney and speaking to the Court, Petitioner agreed to a twenty-five-year sentence for especially aggravated robbery and eleven months and twenty-nine days for theft of property, to be served concurrently with the life sentence [Doc. 11-1 p. 39-42, 46; Doc. 11-3 p. 149-54].

The TCCA affirmed on direct appeal[3], and the Tennessee Supreme Court denied discretionary review [Doc. 11-10; Doc. 11-13]. *See also Castillo I*, 2004 WL 1149497, at * 1.

Thereafter, Petitioner filed a pro se petition for post-conviction relief in August 2005 that both counsel and Petitioner later amended [Doc. 11-13 p. 5-21; 29-40; 89-95; 129-30;

---

[3] The TCCA found that because theft is a lesser-included offense of especially aggravated robbery, Petitioner's dual convictions for these offenses was improper [*See* Doc. 11-9 p. 12]. The court remanded the case to the trial court for an order merging the theft conviction into the especially aggravated robbery conviction but otherwise affirmed the judgments [*Id.*].

6

Doc. 11-14 p. 29-33].   Petitioner's post-conviction proceedings were delayed and continued numerous times, and two separate post-conviction attorneys represented Petitioner during the eight-year interim between Petitioner's initial pro se filing and the final post-conviction hearing [*See, generally*, Doc. 11-13].

At the post-conviction hearing, the primary claim addressed was whether trial counsel was ineffective for failing to investigate the claim of self-defense [*See* Doc. 11-14 p. 35].  Post-conviction counsel withdrew all other issues, including those raised by Petitioner in his own amended petition [*Id*. at 34-38].

Petitioner's trial counsel, Edward Miller, testified during post-conviction proceedings that he had been a defense attorney for twenty-five years and had handled hundreds of first-degree murder cases [*Id*. at 88].  Counsel recalled meeting with Petitioner multiple times before trial, and that the topic of self-defense was the primary focus of their meetings [*Id*. at 41-43, 88].  The defense was presented at trial and preserved on appeal [*Id*. at 88-89].

With the aid of a translator, Petitioner testified at the hearing regarding his claim that trial counsel "failed to advance the claim of self-defense" [*Id*. at 57-58].  Petitioner denied watching any videos with trial counsel before trial [*Id*. at 58-62].  Post-conviction counsel played portions of the video from the victim's surveillance system and asked Petitioner to describe what was happening [*Id*. at 62-68].

At a supplemental hearing, post-conviction counsel raised a claim of ineffective assistance of trial counsel based on trial counsel's failure to have Petitioner evaluated for

competency [Doc. 11-15 p. 4]. Both trial counsel and Petitioner testified regarding the claim [*See, generally*, Doc. 11-15]. Trial counsel testified that he would have had Petitioner evaluated if there had been evidence that would raise a suspicion as to Petitioner's competency or sanity at the time of the offense, but that there was not, and such a request "would be contrary to the defense [of self-defense] that was raised" [*Id*. at 13-15]. Petitioner described confrontations with other inmates and depression he experienced for not being able to communicate with his family while jailed awaiting trial [*Id*. at 19-22]. The trial court ultimately determined that Petitioner had not carried his burden and rejected Petitioner's claims of ineffective assistance [Doc. 11-13 p. 135].

Petitioner was granted a delayed post-conviction appeal, and the TCCA appointed counsel to represent him in that proceeding [Doc. 11-18]. On appeal, Petitioner claimed he was entitled to a new post-conviction hearing due to the almost decade-long delay in resolving his post-conviction proceedings, the abandonment of his second post-conviction counsel, and the inadequacy of the interpretation services provided [*Id*.]. The TCCA affirmed the judgment of the post-conviction court. *Castillo v. State*, E2018-00478-CCA-R3-PC, 2020 WL 2193071 (Tenn. Crim. App. May 6, 2020), *perm. app. denied* (Tenn. Oct. 8, 2020) ("*Castillo II*"). The Tennessee Supreme Court denied discretionary review [Doc. 11-25].

On or about March 1, 2021, Petitioner filed the instant petition, raising the following claims, as paraphrased:

Ground 1:    Whether the trial court erred in allowing Petitioner's confession into evidence [Petitioner's Issues 1 and 8].

8

Ground 2:    Whether the trial court erred in excluding reputation testimony about the victim [Petitioner's Issue 2].

Ground 3:    Whether the evidence is legally sufficient to support Petitioner's first-degree murder conviction [Petitioner's Issues 3 and 4].

Ground 4:    Whether Petitioner is entitled to relief on his allegations of ineffective assistance of counsel [Petitioner's Issue 14].

Ground 5:    Whether Petitioner is entitled to relief on his procedurally defaulted claims [Petitioner's Issues 5, 6, 7, 9, 10, 11, 12, and 13].

In response to the Court's Order requiring a response to the petition [Doc. 7], Respondent filed an answer and the complete State-court record [Docs. 11 and 15]. Petitioner did not file a reply, and the deadline to do so has passed [*See* Doc. 7 p. 1]. This matter is ripe for review.

## II.    LEGAL STANDARD

The Court's review of the instant petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which prevents the grant of federal habeas relief on any claim adjudicated on the merits in a State court unless that adjudication (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established" United States Supreme Court precedent; or (2) "resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented." *See* 28 U.S.C. § 2254(d)(1) & (2); *Schriro*, 550 U.S. at 473.

Federal habeas relief may be granted under the "contrary to" clause where the State court (1) arrives at a conclusion opposite that reached by the Supreme Court on a question of law; or (2) decides a case differently than the Supreme Court on a set of materially

9

indistinguishable facts. *See Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). Under the "unreasonable application" clause, a federal court may grant relief where the State court applies the correct legal principle to the facts in an unreasonable manner. *Williams,* 529 U.S. at 407-08; *Brown v. Payton*, 544 U.S. 133, 141 (2005). Whether a decision is "unreasonable" is an objective inquiry; it does not turn on whether the decision is merely incorrect. *See Schriro*, 550 U.S. at 473 ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable –a substantially higher threshold."); *Williams*, 529 U.S. at 410-11. This standard will allow relief on a federal claim decided on its merits in State court only where the petitioner demonstrates that the State ruling "was so lacking in justification that there was an error understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). When evaluating the evidence presented in State court, a federal habeas court presumes the correctness of the State-court's factual findings unless the petitioner rebuts the presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

In addition to the stringent standard for succeeding on the merits of a claim, the grant of habeas relief is further restrained by the requirement of exhaustion and the doctrine of procedural default. 28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999); *Gray v. Netherland*, 518 U.S. 152, 161-62 (1996); *Coleman v. Thompson*, 501 U.S. 722, 731-32, 735 n.1 (1991). A procedural default exists in two circumstances: (1) where the petitioner fails to exhaust all of his available State remedies, and the State

10

court to which he would be required to litigate the matter would now find the claims procedurally barred, and (2) where a State court clearly and expressly bases its dismissal of a claim on a State procedural rule, and that rule provides an independent and adequate basis for the dismissal. *See, e.g., Coleman*, 501 U.S. at 731-32, 735 n.1; *Gray*, 518 U.S. at 161-62; *see also Lovins v. Parker*, 712 F.3d 283, 295 (6th Cir. 2013).

The exhaustion requirement, codified at 28 U.S.C. §2254(b)(1), requires a petitioner to "fairly present," each federal claim to all levels of the state appellate system, meaning he presented the "same claim under the same theory" up to the state's highest court, *Wagner v. Smith*, 581 F.3d 410, 414, 417 (6th Cir. 2009), to ensure that states have a "full and fair opportunity to rule on the petitioner's claims." *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990). In Tennessee, presentation of a federal claim to the TCCA is sufficient to deem the claim exhausted under State law. *See* Tenn. S. Ct. R. 39 (establishing presentation of claim to TCCA is sufficient to exhaust state remedies); *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003) (recognizing Tennessee's rule removing Tennessee Supreme Court as "antecedent for habeas purposes").

Additionally, Tennessee petitioners may generally proceed only through one full round of the post-conviction process, and there is a one-year statute of limitation on such actions. Tenn. Code Ann. § 40-30-102(a) (one-year limitation period), § 40-30-102(c) ("one petition" rule). Therefore, if a petitioner fails to present a claim in a first petition filed within the applicable deadline period, the petitioner is typically prevented from returning to State court to litigate any additional constitutional claims. In such

11

circumstances, the claim is considered technically exhausted but procedurally defaulted. *Gray*, 518 U.S. at 161-62; *Coleman*, 501 U.S. at 732; *Jones v. Bagley*, 696 F.3d 475, 483 (6th Cir. 2012) ("When a petitioner has failed to present a legal issue to the state courts and no state remedy remains available, the issue is procedurally defaulted.").

A procedural default may be circumvented, allowing federal habeas review of the claim, only where the prisoner can show cause for the default and actual resulting prejudice, or that a failure to address the merits of the claim would result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 749-750; *see also Wainwright v. Sykes*, 433 U.S. 72, 87, 90-91 (1977). "Cause" is established where a petitioner can show some objective external factor impeded defense counsel's ability to comply with the state's procedural rules, or that trial counsel rendered ineffective assistance. *Coleman*, 501 U.S. at 753-54. The prejudice demonstrated to overcome the default must be actual, that is, the error must have "worked to [Petitioner's] *actual* and substantial disadvantage, infecting his entire [proceeding] with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original). A fundamental miscarriage of justice of occurs "where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496 (1986). Such a claim requires a "petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Schlup v. Delo*, 513 U.S.

12

298, 324 (1995). In this context, actual innocence "means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998).

While the ineffective assistance of trial counsel can serve as "cause" for a defaulted claim, errors of post-conviction counsel cannot generally serve as "cause" to excuse a procedural default. *Coleman*, 501 U.S. at 752-53. An equitable exception to this rule was established in *Martinez v. Ryan*, which held that the inadequate assistance of post-conviction counsel or the absence of such counsel may establish cause for a prisoner's procedural default of an ineffective assistance of trial counsel claim under certain circumstances. *Martinez v. Ryan*, 566 U.S. 1, 9 (2012). The Supreme Court has described the *Martinez* exception as containing the following requirements:

> [The exception] allow[s] a federal habeas court to find "cause," thereby excusing a defendant's procedural default, where (1) the claim of "ineffective assistance of trial counsel was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim;" and (4) state law requires that an "ineffective assistance of trial counsel [claim] ... be raised in an initial-review collateral proceeding."

*Trevino v. Thaler*, 569 U.S. 413, 423 (2013) (citing *Martinez*, 566 U.S. at 13-14, 16-17). Other attorney errors, including errors of appellate counsel and errors on post-conviction appeal, do not allow a petitioner to assert *Martinez* as an exception to the doctrine of procedural default. *Davila v. Davis*, 137 S. Ct. 2058, 2062-63 (2017); *Martinez*, 566 U.S. at 16.

In determining whether an ineffective assistance of trial counsel claim is substantial, the Court asks whether it "has some merit and is debatable among jurists of reason." *Abdur'Rahman v. Carpenter*, 805 F.3d 710, 713 (6th Cir. 2015) (citing *Martinez*, 566 U.S. at 14). Conversely, "a claim is insubstantial when 'it does not have any merit'" or "'is wholly without factual support.'" *Porter v. Genovese*, 676 F. App'x 428, 432 (6th Cir. 2017) (quoting *Martinez*, 566 U.S. at 15-16).

## III.   ANALYSIS

### A.   Admission of Petitioner's Statement to Police

In Ground 1 (Petitioner's Issues 1 and 8), Petitioner claims that the trial court erred in denying his motion to dismiss his statement to New Mexico State Police as violative of the Fifth Amendment, as "the written and videotaped statement was the product of initial unmirandized verbal statements" to the United States Border Patrol [Doc. 1 p. 11].

Petitioner's trial counsel filed a motion to suppress Petitioner's statement [Doc. 11-1 p. 24]. Counsel alleged that Petitioner was not Mirandized prior to making the statement, and that the statement was unreliable because Petitioner "speaks no English and the statement is the product of communication via an interpreter" [*Id*.]. The trial court held a hearing on February 3, 2003, where the State called United States Border Patrol Agents Andrew Wylie and Felipe Gonzalez to testify [Doc. 11-4 p. 8-30]. Prior to the testimony, trial counsel indicated to the Court that the defense was pursing suppression of the statement because Petitioner was not in lawful custody when he gave the statement [*Id*. at 6].

14

Agent Wylie recalled that after Petitioner was apprehended, he was taken into custody and agents began obtaining identifying information [*Id*. at 14-15]. Agents ran Petitioner's fingerprints through a database and discovered there was an alert on his name [*Id*. at 15]. In the process of obtaining identifying information, agents inquired whether Petitioner had any scars, and Petitioner advised that he had scars from being shot [*Id*. at 21-22]. After agents confirmed Petitioner's fingerprints, they learned Petitioner was wanted in Tennessee for murder and subsequently turned him over to the New Mexico State Police [*Id*. at 15-16].

Agent Gonzalez testified that he participated in Petitioner's interrogation because both he and Petitioner spoke Spanish [*Id*. at 27]. Gonzalez testified that he advised Petitioner of his *Miranda* rights in Spanish, both orally and in writing, and that Petitioner acknowledged his understanding of those rights prior to waiving them [*Id*. at 27-28].

The trial court denied Petitioner's motion, finding that agents had a right to detain Petitioner, that he was advised of his *Miranda* rights in Spanish, that he "clearly demonstrated that he understood he had a right to not talk to the officers," and that Petitioner waived his constitutional right not to incriminate himself [*Id.* at 32-33]. Further, the trial court agreed with the State that the questions regarding Petitioner's scars were merely an attempt to ascertain identity rather than seeking information regarding Petitioner's involvement in a crime [*Id*.].

On appeal, Petitioner alleged that the trial court erred in failing to suppress his statement to the New Mexico police because it was the "product of [Petitioner's] initial,

unmirandized verbal statements" [Doc. 11-7 p. 3]. The TCCA rejected the claim, finding that its "examination of the totality of the circumstances surrounding the defendant's initial questioning by the Border Patrol, his arrest and detention, and his subsequent statements to the New Mexico State Police" demonstrated that Petitioner "knowingly and voluntarily waived his right to self-incrimination prior to making his [incriminating] statement." *Castillo I*, 2004 WL 1149497, at *5-6.

The Fifth Amendment to the United States Constitution, applicable to the States through the Fourteenth Amendment, provides criminal defendants a privilege against compulsory self-incrimination. U.S. Const. Amend. V ("No person . . . shall be compelled in any criminal case to be a witness against himself[.]"); *Malloy v. Hogan*, 378 U.S. 1, 6 (1963) (holding Fifth Amendment is applicable to the States via the Fourteenth Amendment). An accused subject to a custodial interrogation may waive this privilege, provided he voluntarily, knowingly, and intelligently executes the waiver. *Miranda*, 384 U.S. at 444-45. A valid waiver, therefore, prevents a statement from being "compelled" in the constitutional sense. *Colorado v. Spring*, 479 U.S. 564, 573 (1987) (citation omitted).

Whether a defendant has voluntarily waived his privilege against self-incrimination has two dimensions: (1) the waiver must be a free and deliberate choice, as opposed to the result of intimidation, coercion, or deception; and (2) the waiver "must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). The

16

voluntariness of a defendant's waiver is based on the totality of the circumstances. *Id.* This inquiry takes into account "the background, experience, and conduct of the accused." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). Relevant factors may include the age, intelligence, and education of the accused; whether he was advised as to his constitutional rights; the length of questioning and/or detention; and the use of physical punishment, such as the deprivation of food or sleep. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973).

The Border Patrol subjected Petitioner to questioning for the purpose of identifying him, and the Court finds no evidence in the record that the Border Patrol used coercive tactics during that questioning. As the TCCA noted, Petitioner's transfer to New Mexico authorities was the result of the fingerprint "hit," not his statements to Border Patrol. *Castillo I*, 2004 WL 1149497, at *5-6. Further, as the TCCA found, even if the initial statement to Border Patrol agents did violate *Miranda*, those statements were separated from his subsequent Mirandized statement to New Mexico State Police by three hours, a change in location, a change in the manner of detention, and a change in the person and agency questioning him, thus rebutting any presumption that the Border Patrol's questioning "tainted" the subsequent statements. *Id*. at 6-7. Finally, Petitioner waived his *Miranda* rights after being advised of them both orally and in writing in his native language. *Id*. at 7. Therefore, it is not unreasonable to conclude that the totality of the circumstances demonstrates that Petitioner made a knowing and voluntary waiver of his *Miranda* rights prior to making a statement to the New Mexico State Police.

The Court finds that the decision rejecting this claim is not contrary to, nor is it an unreasonable application of the clearly established law governing the voluntariness of custodial statements, nor was it based on an unreasonable determination of the facts in light of the evidence presented to the State courts. Accordingly, Petitioner is not entitled to relief on this claim.

## B.      Reputation Testimony of Victim

In Ground 2, Petitioner alleges that the trial court erred in excluding proof "of a large cache of weapons stored in the victim's bedroom" and the testimony of Detective Dan Cox regarding the victim's reputation for dealing drugs and firearms [Doc. 1 p. 15]. Citing *State v. Ruane*, 912 S.W. 2d 766, 669-82 (Tenn. Crim. App. 1995), Petitioner argues that Tennessee self-defense case law "permit[s] the introduction of [e]vidence of a victim's violent conduct towards third persons, even if the defendant is unaware of that conduct under certain circumstances [Doc. 1 p. 15].

The trial court held a pre-trial hearing where it determined that evidence regarding the victim's involvement with drugs would not be admissible [Doc. 11-4 p. 47]. At trial, the court held a hearing out of the jury's presence where the defense offered the testimony of Detective Dan Cox [Doc. 11-3 p. 8]. Detective Cox stated that he had been investigating the victim, Jackie Petitt, and had purchased a firearm from the victim [*Id*. at 8-9]. Cox learned that the victim stored a large collection of weapons in his home and was involved in dealing marijuana and cocaine [*Id*. at 10]. After the victim's death, Cox procured a search warrant and located over 50 firearms in the victim's home [*Id*. at 11]. In

18

an oral ruling, the trial judge found the prior drug dealing activities offered as corroborative proof of self-defense would be inadmissible[4], and that the defense could not talk about weapons stored in the lockbox [Doc. 11-3 p. 23]. The trial court authorized Cox's testimony about other weapons, including a silencer found at the scene and any weapons found outside of the locked safe, although the defense elected not to offer the detective's testimony [*Id.* at 23-24].

This issue was raised on appeal, and the TCCA affirmed the trial court's decision. *Castillo I,* 2004 WL 2004 WL 1149497, at *8-9.

Petitioner's federal habeas claim involves an evidentiary ruling raised under State law on appeal [*See* Doc. 11-7 p. 26-28]. Accordingly, it fails to raise a cognizable federal habeas claim. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (holding "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"); *Pulley v. Harris*, 465 U.S. 37, 41 (1984) ("A federal court may not issue the writ on the basis of a perceived error of state law."); *Sinistaj v. Burt*, 66 F.3d 804, 807 (6th Cir. 1995) ("Errors of state law alone cannot form the basis of relief under federal habeas corpus."); *see also McDougald v. Lockhart*, 942 F.2d 508, 510 (8th Cir. 1991) ("Explicit citation to the Constitution or to a federal case is necessary for fair presentation of a constitutional claim in state court.").

---

[4] The trial court did authorize defense counsel to "ask [Petitioner's former girlfriend] about specific instances of [Petitioner's] drug dealing" that she observed [Doc. 11-3 p. 23].

Further, even if this claim could be considered a cognizable § 2254 claim, Petitioner has not demonstrated how the trial court and TCCA's rulings (that the proffered reputation testimony and locked-box weaponry was inadmissible) entitle him to habeas relief given the deferential review required by § 2254. Accordingly, Petitioner is not entitled to habeas relief as to this claim.

### C.    Sufficiency of Evidence

In Ground 3, Petitioner claims that the evidence presented against him is legally insufficient to support his convictions [Doc. 1 p. 17-20]. On direct appeal, Petitioner argued that (1) the prosecution failed to prove beyond a reasonable doubt that Petitioner did not act in self-defense; (2) the prosecution failed to establish premeditation; and (3) the prosecution failed to establish that Petitioner intended to commit a felony at the time of the murder. *Castillo I*, 2004 WL 1149497, at *9-11. The TCCA rejected Petitioner's challenge to the sufficiency of the evidence on its merits. *Id*.

A federal habeas petitioner can successfully challenge the sufficiency of the evidence only when the evidence, viewed in the light most favorable to the prosecution, is such that no reasonable fact finder "could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In considering such a challenge, the Court does not "reweigh the evidence, re-evaluate the credibility of witnesses, or substitute [its] judgment for that of the jury." *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009); *see also Marshall v. Lonberger*, 459 U.S. 422, 434 (1983)

(holding reviewing court does not reweigh evidence or redetermine credibility of witnesses whose demeanor has been observed by the trial court).

At the time of Petitioner's trial, Tennessee law defined self-defense as follows:

> A person is justified in threatening or using force against another person when, and to the degree, the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person must have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds. There is no duty to retreat before a person threatens or uses force.

Tenn. Code Ann. § 39-11-611(a) (West 2007). The defense is unavailable if the initial aggressor withdraws the attack and the individual attempting to raise the defense is no longer in danger. *See, e.g., Nance v. State*, 210 Tenn. 328, 332-33, 358 S.W. 2d 327, 329 (Tenn. 1962). The prosecution must negate the defense of self defense beyond a reasonable doubt once it is properly raised, but ultimately, the issue is one for a jury to decide. *See, e.g.*, Tenn. Code Ann. § 39-11-201(a)(3), § 39-11-601, § 39-11-611; *State v. Ivy*, 868 S.W.2d 724, 727 (Tenn.Crim.App. 1993).

Here, Petitioner's jury saw a videotape in which Petitioner shot the unarmed victim in the back of the head as he was walking away from Petitioner [*See* Doc. 11-3 p. 43-44]. Therefore, the record and applicable law support the TCCA's determination that "[a] reasonable juror could have found that the state negated the defendant's claims of self-defense beyond a reasonable doubt." *Castillo I*, 2004 WL 1149497, at *10.

21

Petitioner next argues that the evidence was insufficient to support his conviction for first-degree murder, as there was insufficient proof of premeditation [Doc. 1 p. 17]. Premeditation of murder "is a [killing] done after the exercise of reflection and judgment," but "the purpose to kill [need not] pre-exist in the mind of the accused for any definite period of time." Tenn. Code Ann. § 39-13-202(d) (West 2007). Like self-defense, the element of premeditation is a question for the jury to answer upon consideration of all of the "circumstances surrounding the killing." *State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000). Tennessee law presumes homicides to be second-degree murder; the prosecution must prove premeditation to elevate the offense to first-degree murder. *See State v. Nesbit*, 978 S.W.2d 872, 898 (Tenn. 1998).

In considering this claim, the TCCA found:

> We conclude the state has overcome the presumption of second[-]degree murder. The record indicates the defendant used a deadly weapon on a beaten, unarmed, defenseless, wounded victim. The defendant walked away from the victim to retrieve the weapon used to inflict the fatal injury, indicating a cool purpose and intent to kill formed prior to the act itself. The victim, at the time he was shot in the back of the head, was staggering and walking away from the defendant. Viewing the evidence in the light most favorable to the state, as we must, we conclude the evidence was sufficient to support premeditated first[-]degree murder.

*Castillo I*, 2004 WL 1149497, at *11. These findings are supported by the record. Accordingly, the TCCA could have reasonably concluded that legally sufficient proof of premeditation was presented at trial.

Finally, Petitioner argues that the evidence is insufficient to establish felony murder because the homicide was merely collateral to the robbery or theft [Doc. 1 p. 20]. As the

22

TCCA found, this conviction was merged with the first-degree murder conviction, and therefore, Petitioner would stand convicted of first-degree murder even if he succeeded on his felony murder claim. *Castillo I*, 2004 WL 1149497, at *11. Regardless, the jury viewed a videotape showing Petitioner shoot the victim, search his pockets, remove property from the victim, and pocket the property [Doc. 11-3 p. 44]. Therefore, as the TCCA found, "a reasonable jury could have found the killing was sufficiently connected to the robbery/theft since there clearly was a connection in time, place and continuity of action." *Castillo I*, 2004 WL 1149497, at *11.

This Court finds that a reasonable juror could have viewed the proof presented at trial, particularly the video-recorded evidence, and found beyond a reasonable doubt from that evidence that Petitioner was guilty of first-degree and felony murder and that self-defense was not proved. Accordingly, the Court finds that the decision rejecting this claim is not contrary to, nor is it an unreasonable application of *Jackson*, nor was it based on an unreasonable determination of the facts in light of the evidence presented to the State courts. Accordingly, Petitioner is not entitled to relief on this claim.

### D. Ineffective Assistance of Counsel

Petitioner claims that he was denied the effective assistance of trial and appellate counsel [Doc. 1 p. 27-28]. Claims of ineffective assistance of counsel are governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), which requires a habeas petitioner to satisfy a two-prong test to warrant federal habeas corpus relief: (1) he must demonstrate constitutionally deficient performance by counsel, and (2) he must

23

demonstrate actual prejudice as a result of such ineffective assistance. *Strickland*, 466 U.S. at 687. Conclusory allegations of wrongdoing by counsel "are insufficient to state a constitutional claim." *Wogenstahl v. Mitchell*, 668 F.3d 307, 335 (6th Cir. 2012) (citing *Workman v. Bell*, 178 F.3d 759, 771 (6th Cir. 1998)). Rather, deficiency is established only when a petitioner can demonstrate that counsel's performance falls below an objective standard of reasonableness as measured by professional norms, such that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687-88. A reviewing court's scrutiny is to be highly deferential of counsel's performance, with an effort to "eliminate the distorting effects of hindsight." *Id.* at 689. In fact, counsel is to be afforded a presumption that his actions were the product of "sound trial strategy" and undertaken with the exercise of reasonable professional judgment. *Id.*

Prejudice is established when the petitioner can demonstrate to a reasonable probability that the result of the proceedings would have been different but for the challenged conduct, thereby undermining confidence in the reliability of the outcome. *Id.* at 694. However, an error, even if professionally unreasonable, does not warrant setting aside the judgment if it had no effect on the judgment. *Id.* at 691.

Petitioner's discrete ineffective assistance of counsel claims were not exhausted by presentation of the claims to the TCCA, and there is now no avenue by which he may exhaust them in State court. *See* Tenn. S. Ct. R. 39; *see also* Tenn. Code Ann. § 40-30-102(a) and § 40-30-102(c). Therefore, each of these claims are technically exhausted but procedurally defaulted. *See, e.g., Jones*, 696 F.3d at 483. Petitioner

24

concedes that he defaulted these claims but argues that the ineffective assistance of trial counsel and abandonment by post-conviction counsel constitute "cause" for the defaults under the holding of *Martinez* [Doc. 1 p. 6-7].

Respondent contends that *Martinez* is a nonstarter for Petitioner, as the holding applies only to claims defaulted in initial collateral proceedings, and most of Petitioner's claims were raised in initial post-conviction proceedings but abandoned on appeal. *See, e.g., West v. Carpenter*, 790 F.3d 693, 698-99 (6th Cir. 2013) ("[A]ttorney error at state post-conviction appellate proceedings cannot excuse procedural default under the *Martinez-Trevino* framework). However, the Court finds that this framing oversimplifies Petitioner's argument, which is that initial post-conviction counsel performed ineffectively by withdrawing virtually all of the ineffective assistance of trial counsel claims raised pro se by Petitioner during the initial post-conviction proceedings. The Court acknowledges that the record contains an explicit discussion and determination that all post-conviction issues save counsel's performance with regard to the self-defense investigation were withdrawn [*See, e.g.*, Doc. 11-14 p. 34-39].[5] However, Petitioner did not speak English at the time of the hearing, post-conviction counsel had only met with Petitioner face-to-face with an interpreter the day prior to the proceedings, post-conviction counsel's request for a continuance was denied, he was allowed approximately six hours to meet with his client prior to the hearing, and when questioned whether he agreed to the withdrawal of his other

---

[5] In a supplemental amended petition, post-conviction counsel later raised a claim that trial counsel rendered ineffective assistance in failing to have Petitioner's competency evaluated [Doc. 11-13 p. 129-30].

claims, Petitioner stated that he thought post-conviction counsel would "do something that will benefit [Petitioner]" [*Id*. at 38]. Therefore, the Court is not convinced that Petitioner understood and approved of post-conviction counsel's withdrawal of his claims, and the Court will not rely on *West* nor its progeny for claims not presented on post-conviction appeal. Rather, the Court will consider whether the ineffective assistance of trial counsel claims raised by Petitioner are substantial.

### 1. Counsel's investigation of grand jury foreperson.

In his first claim of ineffective assistance of counsel, Petitioner alleges that "trial counsel . . . did not adequately investigate the grand jury foreperson, of Grainger County, which, indicted the Petitioner . . . nor did not review the states witnesses or their reports to have prevented such reports and evidence from being placed to petitioner's jurors" [Doc. 1 p. 27].

In his pro se amended petition for post-conviction relief, Petitioner argued that his grand jury was unconstitutionally selected and impaneled, as there had never "been any Spanish or black foreperson appointed as a grand juror" in Grainger County [Doc. 11-13 p. 92]. The Court presumes, therefore, that Petitioner's federal habeas claim is that trial counsel performed ineffectively in failing to raise an equal protection challenge to the selection of the grand jury foreman. *See, e.g., Rose v. Mitchell*, 443 U.S. 545, 556 (1979) ("Because discrimination on the basis of race in the selection of members of a grand jury thus strikes at the fundamental values of our judicial system and our society as a whole, the Court has recognized that a criminal defendant's right to equal protection of the laws

26

has been denied when he is indicted by a grand jury from which members of a racial group purposefully have been excluded.")  However, Petitioner has not presented any evidence, statistical or otherwise, that the procedure employed to select his foreperson resulted in the "substantial underrepresentation" of his identifiable group.  *Id.* at 565.  Therefore, the Court finds that this conclusory argument is unsupported, and therefore, is insufficient to make out a substantial claim of ineffective assistance of trial counsel.  *See Wogenstahl*, 668 F.3d at 335.  Accordingly, *Martinez* fails to provide cause for the procedural default of this claim.

### 2.    Counsel's failure to protect Petitioner against double jeopardy.

Petitioner next alleges that trial counsel performed ineffectively in failing to protect his "right against double jeopardy" [Doc. 1 p. 27].

The Double Jeopardy Clause of the Fifth Amendment, which applies to the states through the Fourteenth Amendment, provides that a person may not "be subject for the same offense to be twice put in jeopardy of life or limb."  U.S. Const. amend. V, XIV; *see also Benton v. Maryland*, 395 U.S. 784, 794 (1969) (holding Double Jeopardy Clause of Fifth Amendment applies to the States through the Fourteenth Amendment).  It protects, among other things, "against multiple punishments for the same offense" in a single proceeding.  *Missouri v. Hunter*, 459 U.S. 359, 366 (1983) (citation omitted).  The test to determine whether the punishment of one course of conduct under two different statutes violates double jeopardy "is whether each provision requires proof of a fact which the other does not."  *Id*. (quoting *Blockburger v. United States*, 284 U.S. 299, 304 (1932)).

27

Here, Petitioner's two murder convictions were merged at sentencing [Doc. 11-1 p. 40]. Therefore, there are not dual convictions or cumulative sentences raising a double jeopardy issue. *See Whalen v. United States*, 445 U.S. 684, 693-95 (1980) (finding cumulative punishments for an offense and lesser-included offense offends double jeopardy principles); *Pandelli v. United States*, 635 F.2d 533, 539 (6th Cir. 1980) (where offenses merge for purpose of double jeopardy, "cumulative sentences are forbidden"). Accordingly, this claim is not substantial and is without merit. The *Martinez* exception does not, therefore, constitute cause for the default.

### 3.  Counsel's failure to raise objections.

Petitioner next alleges that trial counsel failed "to raise his objections at trial, in his new trial motion and direct appeals" [Doc. 1 p. 27].

However, Petitioner does not provide specific instances in which trial counsel failed to object, nor does he demonstrate how the failure to object prejudiced him in any way. Pure speculation offers no basis to conclude that a defaulted allegation of ineffective assistance of trial counsel is substantial. *Wogenstahl*, 668 F.3d at 335. Therefore, *Martinez* fails to provide cause for the default of this claim.

### 4.  Counsel's failure to move to suppress videotape evidence.

Petitioner next claims that trial counsel was ineffective for failing "to move to suppress the videotape after establishing such evidence had been tampered with" [Doc. 1 p. 27].

28

Petitioner does not state how introducing the videotape may have violated his constitutional rights, nor does he state how counsel failing to object to the videotape was deficient performance that prejudiced him. Pure speculation offers no basis to conclude that a defaulted allegation of ineffective assistance of trial counsel is substantial. *Wogenstahl*, 668 F.3d at 335. Therefore, Petitioner may not rely on *Martinez* to excuse this default.

### 5. Counsel's failure to move for judgment of acquittal.

Petitioner next claims that counsel was ineffective for failing to move for a judgment of acquittal "following the states errors and malicious prosecution" [Doc. 1 p. 28].

Petitioner does not provide any details or record references to support his claim. As pure speculation offers no basis to conclude that a defaulted allegation of ineffective assistance of trial counsel is substantial, *Wogenstahl*, 668 F.3d at 335, *Martinez* does not constitute cause for this default.

### 6. Counsel's failure to raise errors in Petitioner's direct appeal.

In Petitioner's final claim of ineffective assistance, he alleges that trial counsel was ineffective for "failing to raise such errors and violation in Petitioner's direct appeals proceedings" [Doc. 1 p. 28]. This is a claim of ineffective assistance of appellate counsel, and the *Martinez* exception is limited to consideration of *trial* counsel's conduct. *See Davila v. Davis*, 137 S. Ct. 2058, 2062 (2017) (declining to extend *Martinez* to procedurally defaulted claims of ineffective assistance of appellate counsel). Furthermore, Petitioner does not allege with specificity what errors and violations he desired counsel to object to,

29

nor did he state how failing to do so prejudiced him. Accordingly, this is an insubstantial, speculative claim that does not excuse the procedural default. *See, e.g., Wogenstahl*, 668 F.3d at 335.

### E. Remaining Claims are Procedurally Defaulted [Petitioner's Issues 5-7, 9-13].

Petitioner failed to pursue to the TCCA his federal habeas claims of double jeopardy[6]; the unconstitutional selection and empanelment of the grand jury foreperson; the failure to sever the offenses; that the trial court failed to instruct the jury to ignore the Gonzalez report; that the trial court erred in allowing the crime scene videotape and diagram to be offered into evidence[7]; that the prosecutor was improperly allowed to lead witness Jarnigan; and that the twenty-five-year consecutive sentencing agreement Petitioner entered into as to the offense of especially aggravated robbery was not knowing or voluntary. These claims (Petitioner's claims 5, 6, 7, 9, 10, 11, 12, and 13) are therefore, technically exhausted but procedurally defaulted. *See, e.g., Gray*, 518 U.S. at 161-62; Tenn. Code Ann. § 30-102(a) and § 40-30-102(c).

To the extent Petitioner attempts to rely on *Martinez* to excuse the procedural default of these claims, the Court finds the applicable inapplicable, as *Martinez* only applies to allegations of ineffective assistance trial counsel. *See Martinez*, 566 U.S. at 9; *see also*

---

[6] The Court has otherwise found the issue without merit, as the trial court merged the two murder charges [Doc. 11-1 p. 122]. *See* Part III.D.2, *supra*.

[7] Further, as Respondent notes, it is unclear that Petitioner even raises a federal claim under § 2254(a), as the claim involves a State-law evidentiary challenge. *See Estelle*, 502 U.S. at 67-68 (holding "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions").

30

*Davila v. Davis*, 137 S. Ct. 2058, 2063 (2017). The Court otherwise finds that there is no cognizable cause for Petitioner's default or demonstration of resulting prejudice, and there is no suggestion by Petitioner that he is actually innocent. Therefore, these claims are procedurally defaulted and barred from review.

## IV. CERTIFICATE OF APPEALABILITY

A petitioner must obtain a certificate of appealability ("COA") before he may appeal this Court's decision denying federal habeas relief. 28 U.S.C. § 2253(c)(1). A COA will not issue unless a petitioner makes "a substantial showing of the denial of a constitutional right" of any claim rejected on its merits, which a petitioner may do by demonstrating that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). To obtain a COA on a claim that has been rejected on procedural grounds, a petitioner must demonstrate "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484. Applying this standard, the Court concludes that a COA should be denied in this case.

## V. CONCLUSION

For the reasons set forth above, the instant petition for a writ of habeas corpus will be **DENIED**, and this action will be **DISMISSED WITH PREJUDICE**. A certificate of appealability from this decision will be **DENIED**.

31

Further, the Court **CERTIFIES** that any appeal from this action would not be taken in good faith and would be totally frivolous.  Fed. R. App. P. 24.

**AN APPROPRIATE JUDGMENT ORDER WILL ENTER.**

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE